2012 VT 17

In re Town Highway No. 20, Town of Georgia (Petition of John Rhodes)

John Rhodes v. Town of Georgia

In re Unnamed Town Highway of Town of Georgia

[45 A.3d 54]

Nos. 10-100 & 10-338

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed March 23, 2012

236

*Joseph F. Cahill, Jr.* and *Michael S. Gawne* of *Brown, Cahill, Gawne & Miller, P.C.*, St. Albans, for Petitioner-Appellee and Plaintiff-Appellee/Cross-Appellant.

*Joseph A. Farnham* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan*, Burlington, for Respondent-Appellant and Defendant-Appellant/Cross-Appellee.

¶ 1. **Skoglund, J.** In 1995, John Rhodes, a resident of the Town of Georgia, petitioned his local governing body, the selectboard, to clarify several issues surrounding two roads that bordered his land. While this case began as a suit over the existence and use of two ancient roads, it grew over time into a test of constitutional guarantees and a saga about abuse of power. After almost fifteen years of litigation, including two side trips to federal court, the trial court entered judgment against the Town of Georgia. The court found that Rhodes's request to access his land over town roads had been repeatedly and maliciously frustrated by the .Town selectboard in an ongoing attempt to protect the value of a neighbor's property, a violation of Chapter I, Article 7 of the Vermont Constitution, the Common Benefits Clause. The court concluded that Article 7 was self-executing and awarded monetary damages for the constitutional violation. In this consolidated appeal, the Town of Georgia seeks to overturn the trial court decision. As explained below, we affirm the judgment of liability but reverse the damage award and remand for further proceedings.

¶ 2. This appeal stems from two separate actions, both involving the same three parties and both — as noted — resulting from a dispute over the existence and use of two ancient roads. Because they are inextricably linked, we review both appeals as one. The underlying facts are largely uncontested. The procedural history is quite lengthy but essential to a full understanding of the case.

¶ 3. The two country roads at the heart of this conflict traverse the woods and fields of Georgia, Vermont. The first road, Town Highway #20 (TH #20), was officially laid out by the Georgia selectboard in 1813. One section runs for 600 feet along the southeastern border of Rhodes's 320-acre farm and divides his farm from his neighbors, the Bechards (neighbors). The second road (Unnamed Road) runs along Rhodes's southwestern border for approximately 2500 feet and intersects with TH #20 and another road in the vicinity of neighbors' house.

¶ 4. In 1971, the selectboard voted to discontinue a portion of TH #20 that bordered Rhodes's farm. At around the same time, a culvert was installed under the Unnamed Road near its inter-

section with TH #20. The culvert made it possible for Rhodes and neighbors to access land they individually owned via the Unnamed Road — it was otherwise impassible to vehicle traffic. It also allowed the Town to access a gravel pit owned by neighbors. In 1994, current neighbors' father owned neighbors' property. Father asked the Town to remove the culvert. Without providing justification, the selectboard, whose chair at the time was father's son (current neighbors' brother), ordered the culvert removed, an act that prevented Rhodes from driving any vehicles along the Unnamed Road or accessing his adjoining land.

¶ 5. In 1995, Rhodes sent a formal application to the selectboard requesting that it: (1) determine the location of TH #20 where it bordered his farm; (2) reconsider its 1971 decision to discontinue that portion of TH #20; (3) give him permission to pay for improvements to TH #20 to make it passable for vehicles year-round; and (4) order neighbors to remove the fenced gate they had erected in the middle of TH #20 and the farm equipment and other personal property they stored in the TH #20 right-of-way. In addition to seeking access to his lands, Rhodes's request was motivated in part by an interest in subdividing the upper portion of his property, which would require improved vehicle access along TH #20 and the Unnamed Road, though his plans in that regard remain unclear to this day. Neighbors, apparently also planning a subdivision of their farm, opposed Rhodes, claiming his farm did not abut TH #20. The selectboard denied all of Rhodes's requests in April 1997 and granted neighbors permission to store property in the TH #20 right-of-way because it "does not present a problem." Rhodes appealed this decision to the superior court.

¶ 6. In his petition to the superior court in 1997, Rhodes claimed that the selectboard had erred in determining the limits of TH #20 and improperly concluded TH #20 had been discontinued and reclassified in 1971. He also argued that the selectboard's decision had "denied [him] access as a matter of law to his property" and "improperly . . . grant[ed] an adjacent property owner, [neighbors], the right to continue to use a portion of the right of way to store personal property . . . in a manner which obstructs and interferes with use of the Town Highway #20 by [Rhodes] and refus[ed] to require [neighbors] to remove the fence and barbed wire gate [they] erected." Neighbors intervened and cross-claimed, requesting, among other things, that the court

make a declaratory judgment regarding their rights to a prescriptive easement over a "pent" road on Rhodes's property running roughly parallel to the Unnamed Road.

¶ 7. The case was heard over five days in January and July 2001. Rhodes presented his claim of discrimination. He alleged that the selectboard had acted in an "arbitrary and capricious manner" in denying his right to improve TH #20 and refusing to require neighbors to remove their personal property from the right-of-way, and that the selectboard had treated him differently from other property owners in the Town similarly situated on trails and class 4 roads. He agreed that the Town had the right to regulate his use of TH #20, but argued that "such regulation should not be inconsistent or place him in a different position than any other property owner or member of the public," and that the selectboard's decision to deny him access and grant neighbors the right to continue to use TH #20 for personal storage was "an uneven application of governmental power [that was] fundamentally unfair."

¶ 8. The trial court (Joseph, J.) ruled in Rhodes's favor. *In re Town Highway #20, Town of Georgia*, No. S173-97Fc (Vt. Super. Ct. June 27, 2002) [hereinafter *Town Highway #20*]. The court found that the selectboard's 1971 decision discontinuing the road was flawed and thus had no legal force and dismissed neighbors' cross-claim of adverse possession and prescriptive easement. It also determined that TH #20 abutted Rhodes's farm. The court further found that the Town "has a policy of permitting landowners to improve class 4 Town Highways at their own expense so that they can gain vehicular access to their property" and that "[i]n the 1990's 'less than a dozen' property owners made requests to the Town for permission to improve class 4 highways at their own expense. . . . [Rhodes] is the only landowner whose request to make such improvements was denied." The court noted that the need to improve TH #20 was a safety issue. It additionally found that neighbors had placed an old hay baler in the TH #20 right-of-way to prevent Rhodes from replacing the large culvert that the Town removed in 1994 and had built fencing in the right-of-way. The court specifically found that the Town had removed the culvert in order to hinder Rhodes's access to the upper section of his property and to prevent him from subdividing and developing it.

¶ 9. Beyond these findings and conclusions, the court ruled:

> The Town of Georgia Selectboard acted in violation of the United States and Vermont Constitutions when it:
>
> a) denied [Rhodes's] request to make improvements in the TH #20 right-of-way at his own expense and
>
> b) when it refused to require [neighbors] to remove their personal property from the TH #20 right-of-way.

In support of this ruling, the court noted that in making its decision the selectboard was specifically concerned with how further development of TH #20 would affect neighbors' "privacy and enjoyment" of their property. The court found that the selectboard knew that neighbors wanted to prevent the development of Rhodes's property and that the selectboard members were "sympathetic to [neighbors'] concern." The court further concluded that the Town had denied permission to Rhodes "because it does not want him to develop his [upper] parcel in a way that would bring in a large number of new homes and cause an increase in traffic near [neighbors'] residence." This bias, the court concluded, constituted "unconstitutional discrimination" because "[t]he Town simply cannot deny Mr. Rhodes the right to improve and use a public highway if they give that right to other property owners in similar circumstances."

¶ 10. Finally, the court concluded that through this behavior the selectboard had violated Article 7 of the Vermont Constitution by showing "favoritism" to a "single person, family, or set of persons" in the community. (Quoting Vt. Const. ch. I, art. 7.)[1] The court then directed the selectboard to allow Rhodes to improve TH #20 "under the same terms and conditions given to other owners of property abutting TH #20" and "to order that [neighbors] remove all of their personal property from the TH #20 right-of-way."

---

[1] Article 7 states:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community; and that the community hath an indubitable, unalienable, and indefeasible right, to reform or alter government, in such manner as shall be, by that community, judged most conducive to the public weal.

Vt. Const. ch. I, art. 7.

¶ 11. The Town and neighbors appealed, without challenging the trial court's relevant factual findings. This Court upheld the trial court's rulings as to the location and status of TH #20 and the denial of neighbors' claimed easement. *In re Town Highway No. 20 of Town of Georgia*, 2003 VT 76, 175 Vt. 626, 834 A.2d 17 (mem.) [hereinafter *Rhodes I*]. With regard to the constitutional violation, this Court stated:

> The Town's sole contention is that it did not unconstitutionally discriminate against [Rhodes], as the trial court found. Once we affirm the trial court's decision that the disputed portion of TH #20 is a highway, however, the Town asserts its willingness to comply with this Court's decision and fully accept the trial court's order, including allowing [Rhodes] to improve and maintain TH #20, and ordering [neighbors] to remove all of their personal property from the TH #20 right of way. Because we uphold the trial court's classification of TH #20 as a highway, and the Town is willing to abide by the superior court's order, we do not reach the constitutional issue.

*Id.* ¶ 17.

¶ 12. During the litigation leading to *Town Highway #20*, Rhodes and neighbors became embroiled in another dispute over the existence and location of the Unnamed Road and an additional road, the "pent" road over which neighbors had claimed an easement. Neighbors desired to use these roads for access to their gravel pit. Both parties sought to have the selectboard declare the Unnamed Road to be a properly laid out public highway, although they had differing views of its terminus. Neighbors sought a similar declaration with regard to the "pent" road, which Rhodes disputed. In 2001, the selectboard denied the requests. The parties appealed to the superior court, and the Town intervened, claiming neither of the roads was a town highway.

¶ 13. In 2004, the court (Van Benthuysen, J.) concluded that the Unnamed Road was "lawfully created and can be located with reasonable certainty," but the "pent" road was not a town road. *In re Unnamed Town Highway of Town of Georgia*, Nos. S312-01Fc & S381-01Fc (Vt. Super. Ct. Feb. 13, 2004) [hereinafter *Unnamed Road I*]. In locating the Unnamed Road, based on the surveys submitted into evidence, the court ruled that the road crossed Rhodes's property but "end[ed] about 200 feet short of [neigh-

bors'] property." The court concluded that, because the Unnamed Road was being surveyed in 1814 when it was first noted in the Town records, and the surveyor was "measuring an already existing road at a particular location, not setting out a new road," the Unnamed Road must have been legally opened before 1820, when a certificate of opening became a requirement. The court ruled that the "pent" road, on the other hand, which "lacks any ratification or certification, at any time, by the Selectboard of Georgia," "does not exist as a public highway." Neither party appealed this decision.

¶ 14. In response to these two cases, in 2006 — two-and-a-half years after this Court's decision in *Rhodes I* and nearly two years after the trial court's decision in *Unnamed Road I* — the selectboard voted to classify TH #20 as a class 4 road and classify the Unnamed Road as a legal "trail." By this act, the selectboard effectively prohibited the use of motor vehicles on the Unnamed Road, per town policy regarding the use of legal trails. It likewise noted that it would perform no maintenance on TH #20. Rhodes appealed the decision on the Unnamed Road to the superior court under Vermont Rule of Civil Procedure 75.

¶ 15. In this 2006 Rule 75 complaint, Rhodes requested that the court declare the selectboard's classification of the Unnamed Road to be incorrect and in violation of the 2004 decision in *Unnamed Road I*, and sought to reclassify the road as a class 4 highway. Alternatively, if the court found that the classification decision was proper, Rhodes asked for condemnation damages under 19 V.S.A. chapter 5. Ruling on the Town's motion to dismiss, the trial court (Crawford, J.), in June 2006, concluded that the classification decision was proper and did not violate the 2004 trial court decision. *Rhodes v. Town of Georgia*, No. 55-06Fc (Vt. Super. Ct. June 8, 2006) [hereinafter *Unnamed Road II*]. Though the court granted the motion in part, it further determined that an evidentiary hearing was required on the issue of necessity and damages to the extent recoverable under the law. It also granted Rhodes leave to amend his complaint to "state these claims more clearly."

¶ 16. Meanwhile, Rhodes — apparently frustrated at the slow pace of the Town's actions in approving his request to improve TH #20 — filed a civil rights claim in 2005 in federal court under 42 U.S.C. § 1983, claiming discrimination based on the selectboard's actions. The Town moved for summary judgment in March 2007.

In its ruling on the motion, the federal court noted that Rhodes's claims arose "out of precisely the same set of facts which formed the basis of his prior [state] lawsuits," and that "this action was filed, at least in part, to seek [the Town's] compliance with those state court judgments." The court thus dismissed the claims on res judicata grounds, holding that Rhodes had essentially proved his claims of discrimination in his first action in state court and that he failed to "allege[] or prove[] that state remedies are inadequate." We note that at the time this suit was filed the selectboard had not yet decided to classify the Unnamed Road as a trail.

¶ 17. Throughout this exhaustive litigation, Rhodes still had not received permission from the Town to improve TH #20, nor had neighbors been told to remove their farm implements and fences from the roadway. Apparently deciding to acknowledge the court order, in May 2006, nearly three years after *Rhodes I*, the Town finally ordered neighbors to remove their property from the TH #20 right-of-way and asked Rhodes for a construction estimate for his proposed improvements to TH #20. He submitted an estimate in July 2007, but the selectboard did not act on his submission. Instead, the next month, the selectboard adopted a new set of regulations for the use and improvement of town highways. In September 2007, Rhodes filed a motion asking the trial court to enforce its order in *Town Highway #20* that directed the Town to grant him permission to make improvements in TH #20. He also asked the court to award him damages because of the Town's failure to follow the order.

¶ 18. As permitted by the court in *Unnamed Road II*, Rhodes filed an amended complaint challenging the classification of the Unnamed Road. He claimed that the Town's classification of the Unnamed Road as a trail which "shall not be used by motor vehicles" ignored the long established use of the Unnamed Road by Rhodes and others and had "the practical effect of substantially restricting access to almost 220 acres of [Rhodes's] property." He claimed that the classification was "a continuation of the pattern of conduct by the Town of Georgia through its [selectboard] since 1994 to the advantage of [neighbors] and to the detriment of [Rhodes]." He alleged that the Town had therefore violated 42 U.S.C. § 1983 and the United States and Vermont Constitutions because it "acted under color of law and established a pattern of conduct that treated [Rhodes] differently from other

property owners similarly situated." Specifically he claimed that the Town had used "its regulatory and statutory authority to deny or restrict [his] access and use of [his] property . . . , delaying consideration of his requests in a timely manner, taking an inordinate amount of time to consider his requests, and impos[ing] limits or conditions on his requests which it did not impose on other property owners similarly situated to [Rhodes]." Rhodes thus sought a declaration that the decision to classify the Unnamed Road as a trail was improper, an order that it be reclassified as a class 4 road, and unspecified damages. The Town had the case removed to federal court.

¶ 19. As part of this now-federal litigation, the parties entered mediation involving upgrades to TH #20. It was ultimately agreed that Rhodes would submit plans for improvement of TH #20 for review. Rhodes hired a licensed engineer, who prepared plans which complied with the Town's new regulations. His application to improve TH #20 was filed in August 2008. This second application was denied in September 2008. The selectboard claimed that Rhodes had failed to show such improvement was necessary. The Town recommended that Rhodes limit his improvement of TH #20 to meet the Town's "Recommended Driveway Construction Guidelines."

¶ 20. Around this time, the Town moved for summary judgment in federal court on Rhodes's amended complaint in *Unnamed Road II*, arguing that he had failed to allege sufficient facts to establish that the Town had violated either his procedural or substantive due process rights under the Fourteenth Amendment and § 1983. In November 2008, the federal court granted the Town's motion and dismissed Rhodes's claims. The court explained that "[t]he proper forum to litigate the legality of the Selectboard's classification decision is the [state court]" and held that it would not disturb the state court's 2006 ruling. The trial court reiterated that, as with the previous federal case, the appropriate path for Rhodes to seek post-judgment relief for the Town's noncompliance with prior state judgments was in the state court, and it remanded the case.

¶ 21. Following this decision, the superior court (Joseph, J.) held hearings in May 2009 on Rhodes's motion to enforce the original 2002 decision in *Town Highway #20*, wherein the court had found a violation of Rhodes's constitutional rights. It simultaneously took testimony in the trial phase of *Unnamed Road II* on issues of

necessity and damages. The court issued an opinion and order on January 14, 2010, disposing of both cases. In its unchallenged findings of fact, the trial court listed multiple instances of the selectboard's discrimination against Rhodes. The court found: (1) the Town had granted other landowners permission to make road improvements along the TH #20 right-of-way "without any evidence of specific plans or designs for those improvements," requiring only "that the landowners agree to pay for the cost"; (2) the selectboard had rejected Rhodes's revised improvement plans for TH #20, drawn up by an engineer, in bad faith; (3) the selectboard's suggestion that Rhodes conform his improvement plans to the driveway standards was not authorized by the Town's new improvement policy; (4) "[t]he Town's latest decision [to deny Rhodes's request for improving TH #20] is simply a continuation of the Town's determined attempt to prevent [Rhodes] from improving access to his land in order to protect the value of [neighbors'] property"; (5) for over two years the Town made minimal efforts to have neighbors remove their personal property from the TH #20 right-of-way; (6) the Unnamed Road decisions by the town selectboard "demonstrate a clear and continuing effort by the [selectboard] to show a preference for one property owner, [neighbors], over another property owner, [Rhodes]"; (7) the selectboard chair, who held that position between 1997 and at least 2009, was not credible when he testified that the selectboard did not consider the effect of its decision on Rhodes when it classified the Unnamed Road as a trail; and (8) the classification decision denied Rhodes "access to his property by motor vehicle over the unnamed road," representing "another example of the [selectboard's] discrimination against [Rhodes] and its preference for [neighbors'] property interests." The court additionally found that, as a result of Rhodes's decreased access to a portion of his property serviced by the Unnamed Road from where it intersects with TH #20, he had suffered a diminution in property value equivalent to $830,000, and that he faced a cost increase of 50% for his proposed improvements to TH #20 given the Town's illegitimate — and continuing — delay in granting him permission.

¶ 22. Based on these findings the trial court concluded that, in denying Rhodes's repeated requests to upgrade TH #20, the Town selectboard had used the power of government to discriminate against Rhodes for more than ten years, and that "the

Town's decisions with regard to [Rhodes's] land have all been guided by one motive: to favor the property rights of his neighbors." It further found that the Town's decisions regarding the Unnamed Road were "part of a consistent pattern of discriminatory conduct that has lasted for more than twelve years." The court specifically cited back to the selectboard's 1994 removal of the culvert at neighbors' request as being part of the same desire to prevent Rhodes from gaining vehicle access to his land. The court concluded: "The real reason for the Town's decision [to classify the Unnamed Road a trail] was to deny Mr. Rhodes access to his property in order to benefit [neighbors]."

¶ 23. The court thus ruled that the Town had violated Rhodes's constitutional rights under Article 7 and ordered the Town to approve Rhodes's most recent application to improve TH #20 within thirty days or show cause why the Town should not be held in contempt. Additionally, it ordered the Town to pay Rhodes $830,000 in damages resulting from the change in value to his property and $5000 in attorney's fees, the cost of bringing the enforcement action. The court denied Rhodes's request for punitive damages. The Town appeals this decision, and Rhodes cross-appeals.

¶ 24. Six months after the court's decision, in June 2010, the Town moved to reconsider the court's 2004 ruling in *Unnamed Road I* declaring the Unnamed Road to be a public highway and, alternatively, requested leave to appeal the 2004 decision to this Court. Because the trial court failed to set forth its order on a "separate document" as required by Vermont Rule of Civil Procedure 58(a), the Town argued it was free to move for reconsideration more than six years later. The Town also asked for relief under Rule 60. The court denied these requests, and the Town appealed. We consolidated the appeals for purposes of review.

I.

¶ 25. After such a lengthy recitation of the facts and procedural history, it is useful to restate the central issues before the Court. The questions presented are whether the Common Benefits Clause of the Vermont Constitution provides a self-executing private right of action, and whether damages are available for the violation, or "constitutional tort," in the circumstances presented. The Town's characterization of the case as involving simply a dispute over road improvements and a municipal road-classification

ignores these fundamental issues. While decisions about roads were the conflict's genesis, it is the availability of the constitutional remedy that lies at the heart of this case.

¶ 26. The Vermont Constitution is the fundamental charter of our state and is preeminent in our governmental scheme. It is the expression of the will of the sovereign people of the state and confers upon the government limited powers while simultaneously protecting the basic freedoms of the governed. As such, the constitution stands above legislative and judge-made law, and the rights contained therein speak "for the entire people as their supreme law." *Davis v. Burke*, 179 U.S. 399, 403 (1900).

¶ 27. In the seminal case of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the U.S. Supreme Court held that federal courts have the inherent authority to recognize a private damage remedy for violations of the federal constitution. 403 U.S. 388, 395-97 (1971). Since *Bivens*, this Court — along with the great majority of state courts that have considered the issue — have recognized a corresponding authority to infer a private cause of action under various state constitutional provisions. See *Shields v. Gerhart*, 163 Vt. 219, 234-35, 658 A.2d 924, 934 (1995); see generally S. Humble, *Implied Cause of Action for Damages for Violation of Provisions of State Constitutions*, 75 A.L.R.5th 619 (2000). While certain wrongs may find redress under federal law, we recognize the inherent and independent value in the rights and protections enshrined in our own constitution. "[O]ur constitution is not a mere reflection of the federal charter. . . . It is an independent authority, and Vermont's fundamental law." *State v. Badger*, 141 Vt. 430, 448-49, 450 A.2d 336, 347 (1982); see Vt. Const. ch. I, art. 4 ("Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character . . . .").

¶ 28. Thus, the rights enumerated within our Constitution provide no less authority in supporting a cause of action than the rights set out in our statutes or in this Court's precedent, presuming those constitutional rights are found to be self-executing. Indeed, "[t]o deprive individuals of a means by which to vindicate their constitutional rights would negate the will of the people in ratifying the constitution, and neither this Court nor the

Legislature has the power to do so." *Shields*, 163 Vt. at 223, 658 A.2d at 928.

■ ■ ¶ 29. In determining whether a constitutional provision is self-executing, courts have looked to the standard adopted by the U.S. Supreme Court in *Davis v. Burke*: "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." 179 U.S. 399, 403 (1900) (quotation omitted). We expanded upon this definition in *Shields*, explaining that "a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection." 163 Vt. at 224, 658 A.2d at 928. We thus consider whether the clause in question "contain[s] a directive to the legislature for further action." *Id.*; see *Convention Ctr. Referendum Comm. v. Bd. of Elections & Ethics*, 399 A.2d 550, 552 (D.C. 1979) (concluding that because constitutional clause at issue by its terms expressly required city counsel to enact legislation, it could not be self-executing). Next, we review the legislative history to determine the intended effect of the provision. *Shields*, 163 Vt. at 224, 658 A.2d at 928. Finally, we must ensure that any decision "for or against self-execution . . . harmonize[s] with the scheme of rights established in the constitution as a whole." *Id.* In undertaking this analysis we look to the text and history of the constitutional provision in question. See *id.* We also seek to determine whether acknowledgement of a cause of action would lead to absurd results or create a redundancy of rights or, instead, if such a cause of action is important in our constitutional structure. See *id.* at 225, 658 A.2d at 928-29. Applying these criteria in this case, we conclude that the trial court properly found Article 7 to be self-executing.

■ ¶ 30. In *Baker v. State*, we undertook an extensive analysis of Article 7, examining its text and historical context, in laying out the framework for judging the constitutionality of government action. 170 Vt. 194, 744 A.2d 864 (1999). While Article 7 espouses a democratic truism, it also sets forth a clear restriction on government behavior. It provides:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people,

nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community; and that the community hath an indubitable, unalienable, and indefeasible right, to reform or alter government, in such manner as shall be, by that community, judged most conducive to the public weal.

Vt. Const. ch. I, art. 7. In *Baker*, we began our analysis of this language by recognizing "the affirmative and unequivocal mandate of the first section." 170 Vt. at 208, 744 A.2d at 874. The second section "prohibits not the denial of rights to the oppressed, but rather the conferral of advantages or emoluments upon the privileged." *Id.* We found that this language left "little doubt as to the obligatory nature" of Article 7, and we noted that it was not "merely hortatory or aspirational in effect." *Id.* at 208 n.7, 744 A.2d at 874 n.7. Though we observed that the words "do express broad principles," we recognized the explicit nature of the right they conferred: "the specific proscription against governmental favoritism toward not only groups or 'set[s] of men,' but also toward any particular 'family' or 'single man.'" *Id.* at 208, 744 A.2d at 875 (alteration in original). "[A]t its core the Common Benefits Clause expressed a vision of government that afforded every Vermonter its benefit and protection and provided no Vermonter particular advantage." *Id.* at 208-09, 744 A.2d at 875.

 ¶ 31. In determining whether Article 7 is self-executing we take guidance from *Shields*, which held that Chapter I, Article 1 of our Constitution,[2] providing "[t]hat all persons are born equally free and independent, and have certain natural, inherent, and unalienable rights," was not self-executing. 163 Vt. at 224-25, 658 A.2d at 928. We reasoned that recognizing a right of action under that Article "would lead to absurd consequences," allowing an individual to sue for the right "to pursue and obtain happiness." *Id.* at 225, 658 A.2d at 928. Conversely, we concluded that Article

---

[2] Article 1 in relevant part provides: "That all persons are born equally free and independent, and have certain natural, inherent, and unalienable rights, amongst which are the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety . . . ." Vt. Const. ch. I, art. 1.

13 set forth a specific free speech right,[3] — "[t]hat the people have a right to freedom of speech" — and found that provision to be self-executing. *Id.* at 227, 658 A.2d at 930. The protection set forth in Article 13, we explained, is "a fundamental characteristic of democratic government"; it is the "right of the people to make themselves heard." *Id.* And, although the language of the Article did not identify any means for protecting that right, stating only that the freedom of expression "ought not to be restrained," we found that it "expresse[d] more than general principles alone." *Id.* Indeed, the absence of a legislative directive supported our conclusion that the provision was self-executing. *Id.*

¶ 32. Article 7 expresses a similarly fundamental right: that the government is created to benefit all of the people and that preferential treatment for "any single person, family, or set of persons" is prohibited. Vt. Const. ch. I, art. 7. Though presented as a restriction of government and not a grant of privileges, Article 7 guarantees the right of the people to a government that does not favor any one person or family over another. Government is not for the chosen few. It acts constitutionally only when it benefits and protects all people equally. That right is as clear as the right of free speech set out in Article 13. It is "so certain and definite in character as to form rules for judicial decision." *State v. Carruth*, 85 Vt. 271, 273-74, 81 A. 922, 923 (1911).

¶ 33. Although Article 7 does not provide a private remedy for discriminatory treatment, a similar omission was no impediment to our holding that Article 13 was self-executing. "The lack of a specific remedy should not itself defeat the contention that a constitutional provision is self-executing. . . . [T]he law will provide a remedy for any right amenable to legal enforcement." *Shields*, 163 Vt. at 225, 658 A.2d at 929; cf. *Welch v. Seery*, 138 Vt. 126, 128, 411 A.2d 1351, 1352 (1980) (recognizing that Chapter I, Article 6 of Vermont Constitution — that officers of government are accountable to the people — "is but a truism of a republican form of government" and thus "provides no private right of action"). As was the case with Article 13, it would make little sense for Article 7 to require legislative action in order to prohibit

---

[3] This section provides: "That the people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government, and therefore the freedom of the press ought not to be restrained." Vt. Const. ch. I, art. 13.

biased and exclusionary government actions. See *Shields*, 163 Vt. at 227, 658 A.2d at 930; cf. *Convention Ctr. Referendum Comm.*, 399 A.2d at 551 (holding clause at issue not self-executing because clause stated that legislative body "shall adopt such acts as are necessary to carry out the purpose of this Amendment within one hundred and eighty (180) days of the effective date of this Amendment").

■ ■ ¶ 34. Finally, we examine Article 7 within the context of the Constitution as a whole. As the history of Article 7 suggests, protection of the welfare of the community was central to establishing the egalitarian vision of American democracy. The concept of government exercising its authority inequitably and without a rational basis or for the emolument of a particular group was anathema to that end. In complementing the rights of free speech (Article 13), personal privacy (Article 11), private property (Article 2), fair elections (Article 8), and fair judicial process (Article 4), Article 7 ensures that "the benefits and protections conferred by the state are for the common benefit of the community and are not for the advantage of persons who are a part only of that community." *Baker*, 170 Vt. at 212, 744 A.2d at 878 (internal quotation marks omitted). Given that "the aim of the Common Benefit Clause is to protect the state from favoritism to individuals and to remind citizens of the sense of compact that lies at the heart of constitutional government," *In re Property of One Church Street City of Burlington*, 152 Vt. 260, 263, 565 A.2d 1349, 1350 (1989), recognizing a cause of action to ensure this same goal does no violence to our constitutional scheme. Quite the contrary; affording citizens the right to challenge perceived partiality by a governmental entity ensures vigorous protection for the community compact that is the heart of government. A private right of action under Article 7 does no injury to the framework of protections laid out in our Constitution. Accordingly, we conclude that Article 7 is self-executing.

■ ¶ 35. Concluding that Article 7 is self-executing, however, is merely the first step in our analysis and "means only that the rights contained therein do not need further legislative action to become operative." *Shields*, 163 Vt. at 227-28, 658 A.2d at 930. We next must decide if monetary damages are an appropriate remedy for the constitutional violation. *Id.* at 234, 658 A.2d at 934. As *Shields* recognized, "it may be appropriate to imply a monetary

damages remedy to enforce constitutional rights where the Legislature has fashioned no other adequate remedial scheme." *Id.* As *Shields* also observed, however, "[w]e have been cautious in creating a private damage remedy even where the Legislature has provided no alternative civil remedy." *Id.* at 232, 658 A.2d at 933. Thus, "[w]here the Legislature has provided a remedy, although it may not be as effective for the plaintiff as money damages, we will ordinarily defer to the statutory remedy and refuse to supplement it." *Id.* at 234-35, 658 A.2d at 934. The ultimate question is whether, as Justice Harlan famously observed in *Bivens*, "compensatory relief is 'necessary' or 'appropriate' to the *vindication of the interest asserted.*" 403 U.S. at 407 (Harlan, J., concurring) (emphasis added).[4]

¶ 36. Determining whether a constitutional tort merits monetary relief, therefore, necessarily compels a careful inquiry into the precise nature of the injury alleged and the adequacy of existing remedies to redress it. The question is thus highly contextual, particularly where, as here, the right in question — equal treatment under the law — may be raised in so many circumstances. See, e.g., *Binette v. Sabo*, 710 A.2d 688, 700 (Conn. 1998) (deciding whether to allow damages for state constitutional tort "must be determined on a case-by-case basis" utilizing a "multifactor analysis," including "the nature of the purported unconstitutional conduct," "the nature of the harm," and other factors); *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 291 (N.C. 1992) (recognizing validity of damage award for violation of plaintiff's state constitutional right to free speech while acknowledging that "[v]arious rights that are protected by our Declaration of Rights may require greater or lesser relief to rectify the violation of such rights, depending upon the right violated and the facts of the particular case"). The caution that we raised in *Shields* is accordingly magnified in the context of recognizing a tort remedy under the broad mandate of Article 7.

---

[4] Since *Bivens*, the U.S. Supreme Court has limited the availability of damages when alternative remedies are present. See *Schweiker v. Chilicky*, 487 U.S. 412, 428-29 (1988). It is no longer sufficient under federal law to allege that the available statutory or administrative mechanisms do not afford as complete a remedy as a *Bivens* action would provide. See *id.* at 423 ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations . . . , we have not created additional *Bivens* remedies.").

¶ 37. We conclude, therefore, that it is not sufficient for a plaintiff seeking damages in these circumstances simply to show that he or she lacks a remedy adequate to vindicate the interest asserted. Rather, we conclude that it is necessary and appropriate to establish stringent additional requirements to obtain monetary relief for a violation of Article 7. Combining our understanding of the language and purpose of Article 7, previously discussed, with the care necessary in recognizing a constitutional tort of potentially broad application, we identify three core elements that must comprise any potential constitutional-tort claim based on a violation of Article 7. First, of course, a plaintiff must show the denial of a common benefit. In doing so, the plaintiff must show disparate and arbitrary treatment when compared to others similarly situated. Second, the plaintiff must show that the denial directly favors another particular individual or group. Finally, because we must defer to any "reasonable and just" basis supporting a discretionary judgment by a governmental decisionmaker, *Baker,* 170 Vt. at 214, 744 A.2d at 879, a plaintiff must demonstrate not only that the decision was wholly irrational and arbitrary, but also that it was actuated by personal motives unrelated to the duties of the defendant's official position, such as ill will, vindictiveness, or financial gain.

¶ 38. This final factor — requiring the showing of an entirely unjustified personal motive — is necessary to bar routine suits aimed merely at forcing a political body to change its decision, not through representative politics, but through judicial action. A constitutional tort action under Article 7 is not designed to review the discretionary decisions of another branch of government but to remedy harms caused when a governmental body acts in a wholly arbitrary and unjustified manner in violation of Article 7. This end is served by requiring a showing that the discriminatory treatment of the plaintiff was not only irrational, but motivated solely by an actual desire to harm the plaintiff or by other unjustified personal motives such as self-enrichment or the enrichment of others.

¶ 39. This additional requirement echoes the standard that federal courts routinely apply in so-called "class-of-one" equal protection cases. In *Village of Willowbrook v. Olech,* 528 U.S. 562, 565 (2000) (per curiam), the U.S. Supreme Court recognized that a landowner could sue a municipality for imposing a condition on a land-use permit that it had not required of other landowners, in

violation of the Equal Protection Clause. Although the landowner did not allege that she was part of a "suspect class" or denied a fundamental right, the high court held that she could sue as a "class of one" by showing that she had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. In its per curiam opinion, the Court noted that the landowner had alleged that the municipality's permit requirement was "irrational and wholly arbitrary" and motivated by what the circuit court had characterized as "ill will" and a "spiteful effort to 'get' [the landowner] for reasons wholly unrelated to any legitimate state objective." *Id.* at 563, 564 (citation omitted). In a concurring opinion, Justice Breyer observed that this "added factor" of " 'vindictive action,' 'illegitimate animus,' or 'ill will' " was both necessary and "sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right." *Id.* at 566 (Breyer, J., concurring).

¶ 40. Many lower courts have since applied Justice Breyer's view in requiring a showing in such cases that local officials acted with unjustified personal motives — such as animus, ill-will, or financial gain — wholly unrelated to their official duties. See, e.g., *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (property owners suing under class-of-one equal protection theory for town's denial of permit to install vinyl siding on historic home must show that they were intentionally treated differently from others similarly situated for no rational reason and that the cause of the differential treatment was "a totally illegitimate animus" toward the plaintiff by the defendant) (quotation omitted); *DDA Family Ltd. P'ship v. City of Moab*, No. 2:04CV00392 PGC, 2006 WL 1409124, at *9 (D. Utah May 19, 2006) (developer claiming that city's denial of permit violated equal protection must show that city "*deliberately* sought to deprive it of the equal protection of the laws for reasons of a personal nature" and based on a "totally illegitimate animus toward" developer); *Lakeside Builders, Inc. v. Planning Bd. of Town of Franklin*, No. CIV.A 00-12170-GAO, 2002 WL 31655250, at *4 (D. Mass. Mar. 21, 2002) (unsuccessful applicants for subdivision permit claiming denial of equal protection must show that local board "deliberately sought to deprive them of equal protection of the laws for reasons of a personal or improper nature"); *Lema v. Town of Cicero*, No. 01C0042, 2001 WL 1631893, at *5 (N.D. Ill. Dec. 18, 2001)

(landowner seeking damages for denial of permit in violation of equal protection must show that unequal treatment was "solely motivated by vindictiveness" or "was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective"); *Merry v. Livingston Cnty. Road Comm'n*, No. 258315, 2006 WL 932398, at *4 (Mich. Ct. App. Apr. 11, 2006) (subdivision applicant "asserting a 'class of one' equal protection claim must show that the defendant acted vindictively, and that it exhibited 'illegitimate animus' and 'ill will' "); *Bower Assocs. v. Town of Pleasant Valley*, 814 N.E.2d 410, 418 (N.Y. 2004) (housing developer claiming that town's denial of subdivision permit violated equal protection must prove "impermissible motive"); *Patterson v. Am. Fork City*, 2003 UT 7, ¶¶ 33-34, 67 P.3d 466 (noting that burden of proving discriminatory intent under *Olech* is an onerous one requiring proof of "intentional discrimination grounded in personal animus"); see also *Bell v. Duperrault*, 367 F.3d 703, 710 (7th Cir. 2004) (Posner, J., concurring) (observing that to make out a class-of-one equal protection case a "plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position," such as "animus," "larceny," or "a desire to find a scapegoat" (quotation omitted)); *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995) (permitting equal protection suit based on denial of liquor license and unjust prosecution because "the unequal treatment is alleged to have been the result solely of a vindictive campaign by the mayor"); see generally W. Araiza, *Irrationality and Animus in Class-of-One Equal Protection Cases*, 34 Ecology L.Q. 493, 498 (2007) (noting that since *Olech* "lower courts have continued to insist that the plaintiff show some ill will on the part of the government defendant").

¶ 41. In applying these standards to determine whether monetary relief should be afforded here, we do not write on a blank slate. It is important to recall, however, that the precedents of this and other courts necessarily turn on the particular interest asserted and the remedies otherwise available in those cases. Thus, in *Shields* itself we found that the precise "injury for which [the plaintiff] wants damages is the loss of the property interest in her family day care home license." 163 Vt. at 236, 658 A.2d at 935. We concluded that this was "exactly the injury that the remedies provided by the Legislature seek to avoid by giving

applicants or licensees an opportunity to contest adverse decisions," a remedy which the plaintiff failed to pursue. *Id.* Accordingly, we were not persuaded that the remedies available to the plaintiff were "inadequate" to vindicate the harm alleged, noting further that allowing monetary relief in the circumstances presented could actually discourage licensees from pursuing their administrative remedy and thereby "eviscerate" the statutory scheme. *Id.* at 237, 658 A.2d at 936.

¶ 42. *Shields* relied in part on *Kelley Property Development, Inc. v. Town of Lebanon*, 627 A.2d 909 (Conn. 1993), a Connecticut Supreme Court decision denying compensatory damages to a real estate developer in his civil rights suit against the municipal board that had rejected his subdivision application. The *Kelley* court concluded that adequate alternative remedies were available to the plaintiff in the form of judicial appeal, a tort action for intentional interference, or some form of equitable relief. *Id.* at 923; see also *Rockhouse Mountain Prop. Owners Ass'n v. Town of Conway*, 503 A.2d 1385, 1388-89 (N.H. 1986) (denying damage remedy for town's alleged equal-protection violation in refusing to lay out village roads where adequate alternative relief was available); *Provens v. Stark Cnty. Bd. of Mental Retardation & Developmental Disabilities*, 594 N.E.2d 959, 962 (Ohio 1992) (denying state employee's claim for constitutional damages "where other statutory provisions and administrative procedures provide meaningful remedies"); see generally *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 345 nn.9 & 10 (Cal. 2002) (listing jurisdictions awarding and denying such damages).

¶ 43. Other courts, in a variety of factual settings, have reached the opposite conclusion, holding that monetary damages may be awarded for state constitutional violations. In *Binette v. Sabo*, for example, the same Connecticut court that decided *Kelley* held that a damage remedy was available under the state constitution's search-and-seizure clause, finding no equally effective remedy and no policy reasons to withhold such a remedy. 710 A.2d at 698-99; see also *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 929 (Md. 1984) (recognizing private cause of action for damages under due process and search-and-seizure clauses of Maryland Declaration of Rights); *Brown v. State*, 674 N.E.2d 1129, 1139 (N.Y. 1996) (holding that recognition of private action for damages under equal protection and search-and-seizure provisions of state constitution was "appropriate to ensure the full realization of the rights

they state"); see generally G. Donoghue & J. Edelstein, *Life After Brown: The Future of State Constitutional Tort Actions in New York*, 42 N.Y.L. Sch. L. Rev. 447, 447 n.2 (1998) (listing twenty states and Puerto Rico as permitting money damages for state constitutional torts).

¶ 44. Returning to the case at bar, the trial court's findings — which are unchallenged — leave no doubt that the essential elements of a constitutional tort were satisfied. Indeed, although the trial court understandably characterized the violation as one sounding in equal protection, its findings indicate that the selectboard's relentless discrimination against Rhodes might equally be characterized as a fundamental violation of due process. See *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (observing that "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive" and that "discrimination may be so unjustifiable as to be violative of due process"); *In re JLD Properties of St. Albans, LLC*, 2011 VT 87, ¶ 6, 190 Vt. 259, 30 A.3d 641 (reaffirming settled principle that "a fair trial before an impartial decisionmaker is a basic requirement of due process" (quotation omitted)); *Parker v. Town of Milton*, 169 Vt. 74, 80, 726 A.2d 477, 481-82 (1998) (noting that plaintiffs claimed simultaneously that they "were denied procedural due process because the administrative proceeding was conducted by a biased decisionmaker" and that "they were denied equal protection under the law because they were treated differently from others similarly situated").

¶ 45. The essence of the constitutional violation in this case was the selectboard's repeated failure to provide fair and impartial decisionmaking, the result of a relentless bias against Rhodes and favoritism toward neighbors. To recall the trial court's most salient finding in this regard, it specifically found that the " '[U]nnamed [R]oad' decisions by the Town Select Board demonstrate[d] a clear and continuing effort by the Select Board to show preference" for neighbors over Rhodes and were a prime example of the selectboard's pervasive and ongoing "discrimination against Mr. Rhodes and its preference for [neighbors'] interests," the effect of which was to deny Rhodes reasonable access to his property for many years. There is thus no question that the selectboard invidiously discriminated against Rhodes in violation of due process and Article 7.

■ ¶ 46. The closer question is whether, notwithstanding these findings of blatant discrimination and bias, Rhodes had a remedy adequate to redress the injury without an award of damages for the constitutional violation. Bearing in mind the extraordinary factual circumstances presented and the harm alleged, we have no difficulty recognizing a need for monetary relief in this case. The harm to Rhodes consisted of the selectboard's intentional abuse of office over the course of more than a decade through decisions concerning the Unnamed Road and TH #20 that prevented, obstructed, and delayed his efforts to access his property. These decisions, as the court found, were discriminatory and motivated by self-interest, and therefore violated Rhodes's rights to due process and equal protection.

■ ■ ¶ 47. Injunctive relief in the form of a belated order requiring the selectboard to reverse its decision and reclassify the Unnamed Road from a trail to a class 4 highway does not begin to compensate Rhodes for any emotional and economic injury caused by these actions. Indeed, it was the very corruption of the classification process itself over the span of more than a dozen years that caused the harm in the first place. See *Brown*, 674 N.E.2d at 1141 (holding that award of damages for constitutional tort was necessary where injunctive remedies "all fall short"). Nor was an alternative statutory remedy available in the form of condemnation damages. Having ultimately recognized the Unnamed Road as a town highway, the selectboard's decision to downgrade its status to a trail did not — as we have elsewhere held — constitute a "taking" entitling abutting landowners to compensation. See *Ketchum v. Town of Dorset*, 2011 VT 49, ¶ 13, 190 Vt. 507, 22 A.3d 500 (mem.) (reaffirming rule that "downgrading a road does not involve a taking"); *Perrin v. Town of Berlin*, 138 Vt. 306, 307, 415 A.2d 221, 222 (1980) (holding that downgrading of town highway to a trail "does not involve the acquisition of property rights from the abutting owners" so that "no damages are involved"). Furthermore, while the possibility of judicial review may ultimately overturn a biased decision, see *JLD Props.*, 2011 VT 87, ¶ 13, it does not cure the personal harm inflicted in an exceptional case such as this, involving a lengthy pattern of invidious delay, obstruction, and discriminatory decisionmaking. Accordingly, we conclude that an award of com-

pensatory damages in this case is necessary and proper to vindicate the harm alleged.[5]

¶ 48. Nevertheless, we are not satisfied that the damages awarded by the trial court here were carefully tethered to the harm actually alleged and proved. Based upon an expert appraisal, the trial court measured the harm by the difference between the value of the property with the Unnamed Road denominated as a class 4 highway that would "allow for development," or $900,000, and its value as a trail, which "limits [its] development," or $70,000, resulting in a damage award of $830,000. We note, however, that the trial court also found that Rhodes had no current plans to develop or market the property.

¶ 49. Therefore, we conclude that the actual harm was not the speculative loss in development value, but the anguish and inconvenience resulting from years of efforts to gain reasonable access to the property frustrated by a biased selectboard, together with any additional costs for road improvements caused by the delay. Accordingly, we conclude that the case must be remanded to the trial court for additional proceedings to recalculate the damages actually suffered by Rhodes. In addition to recalculating damages, the trial court on remand may also reconsider the request to reclassify the Unnamed Road as a class 4 road based upon its earlier findings that the Town's decision to classify the road as a trail, while procedurally sound, was improperly and maliciously motivated. See *Bivens*, 403 U.S. at 404-05 (Harlan, J., concurring) (noting that equitable relief against invasions of constitutional interests long preceded recognition of right to monetary damages).

¶ 50. Finally, a brief response to the dissenting opinion on the issue of damages is in order. Deciding whether, in a given case, some form of relief apart from civil damages is adequate to

---

[5] This is not to conclude that injunctive relief is invariably inadequate to remedy the harm resulting from an equal protection or due process violation. See, e.g., *City of Hueytown v. Jiffy Chek Co. of Ala.*, 342 So. 2d 761 (Ala. 1977) (granting plaintiff liquor license after concluding municipality had violated state equal protection clause); *Herrick's Aero-Auto-Aqua Repair Serv. v. Dep't of Transp. & Pub. Facilities*, 754 P.2d 1111, 1116 (Alaska 1988) ("When a court finds that an administrative agency is enforcing its regulations in a way which violates equal protection [under the state constitution], it should enjoin the offending activity."). As noted, each case turns on the particular facts and legal context in which it arises.

remedy a constitutional violation is difficult, and disagreement is not surprising. However, we do not hold, as the dissent suggests, that damages must be afforded when an alternative remedy does not "completely" compensate the injury. *Post*, ¶ 94. We recognize, rather, that the law supports civil damages when an alternative remedy does not *meaningfully* compensate the injury. See *Bush v. Lucas*, 462 U.S. 367, 386 (1983) (rejecting civil-damage award where plaintiffs' claims were governed by comprehensive substantive and procedural statutory scheme providing "meaningful remedies"); *Katzberg*, 58 P.3d at 357 (holding that "[t]he availability of meaningful alternative remedies" counseled against recognition of constitutional tort). In *Bivens*, as the dissent notes, the Supreme Court found that civil damages were appropriate to compensate for the intangible harm occasioned by the Fourth Amendment violation at issue. See 403 U.S. at 395-96. Similar considerations militated in favor of civil damages in cases such as *Brown*, 674 N.E.2d at 1141 (search-and-seizure and equal protection violations), *Corum*, 413 S.E.2d at 290-91 (free-speech violation), and *Binette*, 710 A.2d at 700-01 (search-and-seizure violation), among others.

¶ 51. The same conclusion follows here. Although the dissent asserts that the essence of the injury was the Town's decision to classify the Unnamed Road as a trail, Rhodes sought damages to compensate him for the Town's violation of the Common Benefits Clause, and the trial court found that he had established such a violation by showing a "consistent pattern of discriminatory conduct that has lasted more than twelve years." Subject, of course, to proof of actual injury, an award of civil damages for the mental or emotional distress resulting from such misconduct is clearly necessary to provide meaningful relief, and presents no particular difficulty or novelty. See *Carey v. Piphus*, 435 U.S. 247, 263 (1978) (discerning "no particular difficulty" in showing "that mental and emotional distress actually was caused by the denial of procedural due process itself"); *Walz v. Town of Smithtown*, 46 F.3d 162, 169-70 (2d Cir. 1995) (upholding compensatory damage award for emotional distress suffered by plaintiffs from town's due-process violation in refusing to issue street-excavation permit unless plaintiffs conveyed part of their land to town). The dissent is incorrect, therefore, in asserting that injunctive relief is adequate in these circumstances.

## II.

¶ 52. While cognizant of the potential scope of our holding, we emphasize that it is equally important to understand its limitations. One of the principal concerns militating against the recognition of a constitutional tort in these circumstances is the potential "chilling" effect on those conscientious citizens who contribute their valuable time and resources to serve on local boards. *Kelley*, 627 A.2d at 923-24. It is well to recall, however, that these same individuals are already subject to liability for violations of federal law under 42 U.S.C. § 1983. See *Hafer v. Melo*, 502 U.S. 21, 25-28 (1991) (government officials may be held personally liable for damages under § 1983 based upon actions undertaken within their official authority); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that a municipality "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief").

¶ 53. As noted, the U.S. Supreme Court has recognized that a property owner may bring a civil rights action alleging that local officials violated equal protection or due process by treating the property owner differently from others similarly situated for reasons that were wholly arbitrary and irrational and motivated by personal reasons unrelated to their official duties. *Olech*, 528 U.S. at 565. Innumerable cases have since addressed claims — similar to those brought by plaintiff here — that local land-use decisions were arbitrary and irrational and actuated by ill will, the desire for financial gain, or other unjustified personal motivations and therefore violated the property owner's federal constitutional right to equal protection of the law or due process. Although not always successful, such claims are far from unique. See, e.g., *Nevel*, 297 F.3d at 681 (upholding summary judgment for village where property owner's § 1983 claim that village's denial of building permit to install vinyl siding was "to punish" homeowner failed to establish "totally illegitimate animus"); *Forseth v. Vill. of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000) (holding that landowners had alleged sufficient grounds for § 1983 discrimination claim where they alleged that board president, whose property bordered that of landowners, denied final plat approval "for personal gain" at the expense of landowners); *DDA Family Ltd. P'ship*, 2006 WL 1409124, at **1, 9 (granting summary judgment for town on § 1983 action where residential developer claimed that city's denial

of subdivision permit was result of "animosity" from developer's prior activities but developer failed to adduce evidence "proving totally illegitimate animus toward" developer); *Lema*, 2001 WL 1631893, at \*\*2, 5 (holding that property owner's allegations that city denied business license application "because of his political affiliation and his activities" opposing board president were sufficient allegation of "animus" to support § 1983 action).

¶ 54. Incrementally expanding the exposure of local officials or the municipality for misconduct under the Vermont Constitution does not, therefore, represent a dramatic expansion of potential liability or a compelling basis for nonrecognition of a state constitutional tort.[6] Indeed, even under the very liberal standards of notice-pleading, state and federal courts have routinely granted or upheld dismissals of class-of-one equal protection claims where the facts simply failed to show the requisite malicious intent. See, e.g., *Lakeside Builders*, 2002 WL 31655250, at \*4 (dismissing developer's § 1983 claim that city discriminated in failing to waive subdivision requirements where developer failed to plead facts showing that action was "for reasons of a personal or improper nature"); *Merry*, 2006 WL 932398, at \*4 (upholding dismissal of landowner's suit claiming discrimination in county's denial of subdivision permit where landowner failed to allege that defendant "acted vindictively or with ill will"); *Bower Assocs.*, 814 N.E.2d at 419 (upholding dismissal of § 1983 action claiming that denial of subdivision permit violated equal protection where complaint failed to make "the requisite showing of improper motivation"); *Patterson*, 2003 UT 7, ¶ 34 (upholding dismissal of residential developer's § 1983 action alleging that denial of development permits violated equal protection where complaint fell "short of providing any specific explanation of the source of this [alleged] malevolence").

■■■ ¶ 55. It is equally important to recognize that selectboards and other local agencies exercise considerable authority and influence in the lives of local citizens. Service on such boards,

---

[6] As other courts have noted, the federal statutory remedy under 42 U.S.C. § 1983 generally "creates no impediment to judicial recognition of a damages remedy" under the state constitution, as the civil rights statute is limited to violations of federal law, and the state constitution may protect broader interests than those under the federal constitution. *Binette*, 710 A.2d at 698 n.18; see also *Widgeon*, 470 A.2d at 929 (holding that existence of remedy under § 1983 "is not a persuasive basis" to defeat claim based on state constitution).

however admirable, necessarily and properly carries with it certain ethical and legal responsibilities, not the least being the duty to deal fairly and impartially with all who appear before them. When that responsibility is flagrantly abused to discriminate against one's neighbors for purely personal reasons, we discern no policy reason to withhold liability from local agencies and officials and every reason — on the contrary — to hold them accountable.[7]

■■■ ¶ 56. A related objection expressed by some is the reluctance to transform every local decision into a potential constitutional tort. See *Kelley*, 627 A.2d at 924; *Rockhouse*, 503 A.2d at 1389. The response to this objection is twofold. First, we expressly limit our holding to the specific circumstance where invidious discrimination by a selectboard violates due process and equal protection and results in injury that finds no adequate, alternative injunctive or compensatory relief. As earlier noted, the question whether damages must be made available for the violation of a constitutional right is necessarily determined by the specific facts and legal context in which it arises. In many if not most cases of improper treatment under Article 7 other remedies — equitable, statutory, or otherwise — may well suffice, rendering further litigation either unnecessary or unlikely to succeed. We are not persuaded, therefore, that our decision will result in a flood of litigation or liability.

¶ 57. Second, we have established standards for stating a constitutional-tort claim under Article 7 that will stand as a buffer against liability in all but the most egregious of cases. The requirement of a showing of actual malice or bad faith severely limits the scope of our holding. In so doing it serves the equivalent function of the qualified immunity doctrine otherwise available to local officials "when they perform discretionary acts in

---

[7] Although *Bivens* actions are generally maintained against the individual officials responsible for the alleged misconduct because the United States is immune from suit, see *Bivens*, 403 U.S. at 410 (Harlan, J., concurring), in many cases where a damage remedy is upheld under state constitutional law "it is against the State or its agency, not individual officers." *Cantrell v. Morris*, 849 N.E.2d 488, 504 (Ind. 2006); see, e.g., *Brown*, 674 N.E.2d at 1142 (holding that there was there no reason the state could not be held "liable for constitutional torts by its officers or employees acting in the course of their employment"). Here, by statute, Rhodes was required to sue the Town for the acts of its officers. 24 V.S.A. § 901(a) (requiring that any suit against town officers "shall be brought against such town").

good faith" within the course and scope of their employment. *Morway v. Trombly*, 173 Vt. 266, 272, 789 A.2d 965, 970 (2001) (quotation omitted).

¶ 58. At the same time, we do not go so far as to allow complete immunity in these circumstances. Although the Town invokes the doctrine of municipal immunity to completely absolve itself from liability, we discern no logic or policy purpose in recognizing a constitutional tort derived from our fundamental charter of rights while simultaneously granting the Town immunity because it was performing a "governmental" function. See *id.* at 270, 789 A.2d at 968 (noting Vermont's continued reliance on the "arbitrary governmental-proprietary distinction" for determining municipal immunity (quotation omitted)). As the court in *Corum*, confronting a related issue, explained: "It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity." 413 S.E.2d at 291. Here, the Town selectboard was performing a governmental function, but doing so in a manner that invidiously discriminated against Rhodes in violation of due process and Article 7, and there can be no immunity for such conduct.

¶ 59. Another recognized avenue of redress for claims of unequal treatment by local officials is the ballot box. A political response may well be an appropriate remedy for the perception of unfairness by local decisionmakers. See *Welch*, 138 Vt. at 128, 411 A.2d at 1352 (holding that Chapter I, Article 6 of the Vermont Constitution provides no private right of action and that "[t]he remedy contemplated by it is that of popular election").[8] Unlike Article 6, however, Article 7 is self-executing and creates a specific right; it is more than a mere "truism" of republican government. *Id.* Moreover, an election decided by a majority of the voters is a particularly ill-suited vehicle to right the wrongs visited upon a single person or a minority. The ballot box is not an adequate remedy for the violation in this case. We thus discern no sound

---

[8] Article 6 provides: "That all power being originally inherent in and consequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them." Vt. Const. ch. I, art. 6.

basis to deny a monetary remedy for the constitutional violation alleged and proved in this case.

## III.

¶ 60. The Town advances a number of additional arguments that we find unpersuasive. First, it asserts the trial court lacked subject-matter jurisdiction because in hearing *Unnamed Road II* in 2006 the court did not employ administrative procedures required by statute under Title 19, chapter 7. Specifically, the Town claims that the trial court failed to appoint three commissioners "to inquire into the convenience and necessity of the proposed highway, and the manner in which it has been laid out, altered, or resurveyed." 19 V.S.A. § 741. The Town contends that this administrative process is mandatory, and without it, Rhodes failed to exhaust his administrative remedies, and thus, the trial court could not hear the matter. We disagree.

¶ 61. The applicability of this statutory structure is a question of law, which we review de novo. *Benson v. Hodgdon*, 2010 VT 11, ¶ 10, 187 Vt. 607, 992 A.2d 1053 (mem.). Rhodes's petition to the trial court in 2006 made no request that the court rule on the manner in which any road had been laid out, altered, or resurveyed. See 19 V.S.A. § 741. Rather, he asked that the court determine whether the Town's decision to classify the Unnamed Road a trail was valid. As we recently noted, by its own terms the appointment of commissioners under § 741 is not triggered when the issue before the trial court concerns the reclassification of a road. *Ketchum*, 2011 VT 49, ¶¶ 11-12 (noting that "altered" in § 741 no longer includes reclassification).[9]

---

[9] In an earlier decision, *Hansen v. Town of Charleston*, 157 Vt. 329, 597 A.2d 321 (1991), we held that the trial court had jurisdiction to review a road commissioner's report in a case involving the reclassification of a class 4 highway to a class 3 highway. *Hansen* relied in this regard on 19 V.S.A. § 310(b), which provides that "Class 4 highways may be maintained to the extent required by the necessity of the town, the public good and the convenience of the inhabitants of the town, or may be reclassified using the same procedures as for laying out highways and meeting the standards set forth in section 302 of this title." In *Town of Calais v. County Road Commissioners*, 173 Vt. 620, 795 A.2d 1267 (2002) (mem.), however, we made it clear that § 310(b) does not involve the classification of trails. As we explained, "[a]lthough the language [of § 310(b)] references the procedure for laying out *highways*, appellees' argument is that it was intended to refer to the procedure for laying out *trails*, despite the fact that the Legislature defined a trail as not a highway and there are no standards for trails in § 302." *Id.* at 623, 795

¶ 62. The Town next contends the trial court should have rejected Rhodes's constitutional claims under the doctrine of res judicata because the federal court had already ruled on them. Under the doctrine of res judicata, or more specifically claim preclusion, "a final judgment in previous litigation bars subsequent litigation if the parties, subject matter, and cause(s) of action in both matters are the same or substantially identical." *Faulkner v. Caledonia Cnty. Fair Ass'n*, 2004 VT 123, ¶ 8, 178 Vt. 51, 869 A.2d 103. Whether preclusion applies to the facts at hand is a question of law reviewed de novo. *Id.* ¶ 5. The government conduct at issue before the federal court in 2008 was the Town's decision to classify the Unnamed Road as a trail. The federal court noted that it had already dealt with Rhodes's previous claims of discrimination in 2007 and had dismissed that suit on res judicata grounds because the claims arose out of "prior scuffles" which had been litigated in state court. It limited the scope of its 2008 ruling to Rhodes's appeal of the Town's classification decision, which the state trial court had already considered. See *supra*, ¶ 18 (relating Town's decision to remove case to federal court). In granting summary judgment against Rhodes, the court held that Rhodes had failed to show that state remedies were constitutionally inadequate and refused to "retain jurisdiction over the remaining state law issues." The court again reminded the parties that "to the extent this action has been brought due to [the Town's] non-compliance with prior state court judgments, the appropriate path is for [Rhodes] to seek post-judgment relief in the state court."

¶ 63. We also reject the Town's contention that Rhodes's federal due process claims under § 1983 and his claims for damages under our Constitution are "virtually identical," and thus, Rhodes should have raised his claim for damages under Article 7 before the federal court, and because he did not, he is precluded from doing so now.[10] Claim preclusion applies only where there was a final judgment on the relevant issue. *Faulkner*, 2004 VT

---

A.2d at 1270 (emphasis added). We rejected the argument, observing: "Properly understood, the reclassification language in § 310(b) refers to the option to reclassify a class 4 highway to a higher classification to gain state financial aid." *Id.* That was clearly not the case here.

[10] The Town itself recognizes that Article 7 "finds no precise analog among the rights provided by the U.S. Constitution." Thus, the Town's reliance on *Stevens v. Stearns*, wherein we recognized the "preclusive effect" of a federal court's earlier

123, ¶ 11. Here, the federal court specifically exempted the state law claims from its ruling and remanded the case on those issues. In fact, in its 2007 decision, the federal court expressly precluded Rhodes's federal claims on res judicata grounds because they had already been proven in state court. In short, Rhodes's claim based on the 2002 order and the state law claims remanded from the federal court rest on decisions by the state court. The federal court simply did not decide the issues that are now before us.

¶ 64. Finally, the Town contends that the trial court erred in ruling that it must grant Rhodes approval to upgrade TH #20 because the Town violated Article 7. We see no need to address the Town's argument directly as the Town long ago agreed to approve Rhodes's application to upgrade TH #20. In *Rhodes I*, we explained that "[o]nce we affirm the trial court's decision that the disputed portion of TH #20 is a highway, . . . the Town asserts its willingness to comply with this Court's decision and fully accept the trial court's order, including allowing [Rhodes] to improve and maintain TH #20." 2003 VT 76, ¶ 17. We find no error in the trial court's order that the Town follow through on its repeated promise to approve Rhodes's application or show cause why it should not be held in contempt for its continued failure to comply.

## IV.

¶ 65. Having determined that Rhodes had a cause of action under Article 7 and deserved a measure of damages, we turn to Rhodes's cross-appeal concerning the amount of his damages. He makes two claims. First, he argues that the Town is liable for the $4,907.96 he spent on engineering fees in preparing his second — and most recent — application for permission to improve TH #20 to meet the standards of the Town's 2007 road ordinance. Second, he claims that the trial court erred in denying his claim for punitive damages given the court's finding that the selectboard acted in bad faith and with malice.

¶ 66. Rhodes contends that he is due the additional costs of his engineering work because it resulted from the selectboard's bad-faith conduct in drawing out the permission process with no intention of approving his requests. The trial court did not

ruling on government agents' qualified immunity defense, is misplaced. 2003 VT 74, ¶ 26, 175 Vt. 428, 833 A.2d 835.

address this request. Having earlier determined to remand the matter to the trial court to reconsider generally the issue of damages and equitable relief, we also direct the court to address the question of the additional engineering costs.

¶ 67. As to Rhodes's claim for punitive damages, he suggests such damages are appropriate where the highest authority of the Town acted with malice, arguing that the Town should be treated like any other corporate entity. We disagree. By their very nature, punitive damages are not meant to reward the injured, but to punish and deter the wrongdoer. *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 55, 179 Vt. 167, 893 A.2d 298; accord *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67 (1981). As we have held, to support an award of punitive damages for a defendant's intentionally wrongful conduct, a plaintiff must show that the defendant acted with actual malice: that the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime. *Monahan*, 2005 VT 110, ¶ 55. Regardless of whether the Town's actions meet this standard, however, we hold that, absent a clear legislative directive to the contrary, municipalities are immune from punitive damage awards.

¶ 68. In denying Rhodes's initial motion for punitive damages, the trial court cited the U.S. Supreme Court decision *City of Newport v. Fact Concerts*. There, the high court considered the propriety of an award of punitive damages against a city in a federal § 1983 suit where the city council had acted unlawfully in voiding a contract. 453 U.S. at 252-53. The Court vacated the award because the history and policy behind § 1983 suits did not "support exposing a municipality to punitive damages for the bad-faith actions of its officials." *Id.* at 271. While the development of § 1983 actions and the award of damages under that law are distinct from the right of action we herein recognize under Article 7, the policy rationale for limiting punitive damages is persuasive.

¶ 69. The twin aims behind punitive damages — punishment and deterrence — would not be met if they were levied against a municipal corporation for the malicious and wrongful acts of its officers. Rather than exclusively targeting the wrongdoers, such an award would punish all of the town's taxpayers. See *id.* at 267 ("[A]n award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the

tort. These damages are assessed over and above the amount necessary to compensate the injured party."). As many other courts have recognized, "while the public is benefited by the exaction of such damages against a malicious, willful or reckless wrongdoer, the benefit does not follow when the public itself is penalized for the acts of its agents over which it is able to exercise but little direct control." 18 E. McQuillin, The Law of Municipal Corporations § 53.18.10, at 316 (3d ed. 2003). The same cannot be said for the award of compensatory damages, for while they also fall upon the taxpayers, their purpose is to make an injured party whole, not to punish or deter.

¶ 70. The deterrent aim of punitive damages is likewise unmet in allowing such damages against a municipality. Facing no direct financial hardship, deterrence of individual officials is wanting. As with punishment, the proper vehicle for deterring municipal officials is through public elections. See *City of Newport*, 453 U.S. at 269 ("[T]he compensatory damages that are available against a municipality may themselves induce the public to vote the wrong-doers out of office."). There is little gain in the imposition of punitive damages against a municipality and much potential for misdirected hardship.

¶ 71. Rhodes's claim that a municipal corporation should be treated like a private corporation in assessing punitive damages is unavailing. The impact of punitive damages on the shareholders of a publicly held corporation is significantly different from the impact upon the taxpayers of a municipal corporation. See *id.* at 261-62 (noting long-held distinction between officers of municipal corporation and officers of private corporation with regard to efficacy of punitive damages). In brief, shareholders willingly risk their wealth when investing in a public corporation for the sake of a return on that investment and are not bound to pay damages beyond the company's financial capacity. A municipality's taxpayers, in contrast, make no such equivalent gamble and have a less reliable cap on their liability.

¶ 72. This result is in line with our precedent and that of many of other jurisdictions. See 18 E. McQuillin, *supra*, § 53.18.10, at 314 (observing that in "overwhelming majority of jurisdictions" prohibition on punitive damages against municipality is "firmly established" unless otherwise authorized). An older decision of this Court concluded similarly, if not with quite the same finality. In

*Willett v. Village of St. Albans*, 69 Vt. 330, 38 A. 72 (1897), we considered whether a municipal corporation could be liable for the negligent construction and maintenance of its sewer system when a broken sewer main polluted a brook. The defendant village appealed an award of punitive damages based on this liability, and this Court reversed. Although we speculated whether punitive damages might be available against municipalities under the doctrine of respondeat superior when town officers approve of a malicious act, we did not directly answer that query. *Id.* at 338, 38 A. at 75. Instead, we observed only that the village's negligence did not constitute the type of conduct that generally warrants punitive damages. *Id.* Today, we answer this question. Because the twin aims of punishment and deterrence are not served when punitive damages are levied against a population for the acts of its elected officials, municipal corporations cannot be held liable for punitive damages.

## V.

¶ 73. Lastly, we consider the Town's claims concerning the trial court's 2004 decision on the legal status of the Unnamed Road. Central to the issue is whether the Town's appeal is timely. We conclude that it is not. The trial court issued its written decision in *Unnamed Road I* in February 2004, concluding that the Unnamed Road was a town or public highway. The court remanded the matter to the Town for further classification proceedings "not inconsistent with this decision and Order." The docket entries indicate that the case was officially disposed of by "opinion and order" on "2/13/2004." More than six years later, and after numerous additional proceedings concerning the Unnamed Road, the Town filed a motion in the trial court to reconsider the court's 2004 decision and, alternatively, for relief from judgment under Vermont Rule of Civil Procedure 60(b). The trial court ruled the motion untimely. On appeal, the Town argues that its motion for reconsideration was timely because the court, in 2004, failed to comply with the dictates of Rule 58 and Rule 79, which respectively require that for a judgment to be effective it must be set forth on a separate document and entered into the civil docket.

¶ 74. Rule 58 was amended in 2002 to clarify that a judgment, to be effective, must be set forth in a separate document and is then "effective only when entered as provided in

Rule 79(a)." V.R.C.P. 58. Rule 79 requires the court clerk to maintain a civil docket and make entries for each order or judgment, among other actions. V.R.C.P. 79(a)(2). The separate document requirement in Rule 58 was brought about, in part, by two cases before this Court. In *Baker v. Town of Goshen*, the timeliness of an appeal was at issue after the trial court made its decision orally from the bench, and the docket entry from that day said "CASE CLOSED." 169 Vt. 145, 148, 730 A.2d 592, 594 (1999). Four months later, the court issued a written decision upon one of the parties' request. On appeal, the question of which date of decision — the docket entry or the subsequent written decision — was the "entry of judgment" for purposes of appeal. See V.R.A.P. 4(a) (requiring appeal to be filed "within 30 days of the date of the entry of judgment"). We ruled that Rule 58 required the court to approve and sign a written judgment order, and, without such an order, the docket entry was not an entry of judgment and did not commence the running of the appeal period. *Baker*, 169 Vt. at 150, 730 A.2d at 596. We built upon this logic in *Powers v. Hayes*, holding that an entry order granting a motion for summary judgment did not constitute an entry of judgment when the prevailing party had subsequently filed a proposed judgment order, and the court had not responded to the proposal within thirty days of its ruling. 170 Vt. 639, 640, 751 A.2d 781, 782 (2000) (mem.). In *Powers*, we remarked that Rule 58 "specifically requires action after the court renders a decision in order to reduce that decision to a judgment." *Id.*

¶ 75. In 2006, Rule 58 was again amended to harmonize with the federal rule. The amendment made clear that, in a case where such a document is required but, for whatever reason, has not been created within 150 days of the clerk's entry of the judgment on the docket, the judgment becomes effective automatically. See V.R.C.P. 58(b). The 150 day "cap" is "designed to ensure that the parties will not be given forever to appeal (or to bring a post-judgment motion) when a court fails to set forth a judgment or order on a separate document in violation of V.R.C.P. 58(a)." Reporter's Notes — 2006 Amendment, V.R.A.P. 4 (quotation marks omitted); see Reporter's Notes — 2006 Amendment, V.R.C.P. 58 (referencing Reporter's Notes to Appellate Rule 4 for "further discussion" of 2006 amendment).

¶ 76. Thus, while the trial court's final decision in 2004 may not have included a separate "judgment order," the date-of-

judgment ambiguity that we sought to avoid in amending Rule 58 in 2002 simply was not at issue in this case. Nor is there a serious concern that an ambiguous date of the entry of judgment precluded a party from appealing in a timely manner — the instant appeal was requested well beyond our new 150-day cap. Finally, there was no conflict between the date when the trial court disposed of the case through its order and the date reflected on the docket sheet. Cf. *Burton v. Jeremiah Beach Parker Restoration & Constr. Mgmt. Corp.*, 2010 VT 55, ¶ 14, 188 Vt. 583, 6 A.3d 38 (mem.) (holding that though trial court issued findings and conclusions and docket entry reflected "case closed" on same date, no judgment entered because court still addressing attorney's fees motion); *Hoeker v. Dep't of Soc. & Rehab. Servs.*, 171 Vt. 620, 620-21, 765 A.2d 495, 498 (2000) (mem.) (ruling that docket entry listing "case closed" at same time trial court issued "entry regarding motion" not sufficient to trigger thirty day appeals period when trial court issued written decision three months later). The Town's motion for reconsideration was untimely before the trial court. Its appeal of the 2004 decision is untimely for the same reasons.

¶ 77. The Town claims alternatively that the trial court should have granted its motion for relief under Rule 60(b). Rule 60(b) provides for relief from a final judgment "upon such terms as are just." V.R.C.P. 60(b). The Town specifically requested relief under clauses (5) and (6), which, respectively, permit the trial court to relieve a party from final judgment when "it is no longer equitable that the judgment should have prospective application" and for "any other reason justifying relief from the operation of the judgment." V.R.C.P. 60(b). Under either of these clauses a motion "shall be filed within a reasonable time." V.R.C.P. 60(b). Such a motion "is not subject to appellate review unless it clearly and affirmatively appears on the record that [the trial court's] discretion was withheld or abused." *Adamson v. Dodge*, 174 Vt. 311, 326, 816 A.2d 455, 468 (2002) (quotation omitted). Furthermore, interests of finality require that relief from a previous judgment "should be granted only in extraordinary circumstances." *Id.* at 327, 816 A.2d at 468. Thus, it "is not intended to function as a substitute for a timely appeal." *Tetreault v. Tetreault*, 148 Vt. 448, 451, 535 A.2d 779, 781 (1987).

¶ 78. The trial court denied the Town's Rule 60(b) motion, stating: "More than 6 years have passed since [the 2004] opinion

and order. The Town cannot circumvent its obligation to pursue an appeal from the Superior Court's 2004 decision by asking for relief from judgment now." We agree with the court below that the Town's motion was not filed within a reasonable time. See, e.g., *Callahan v. Callahan*, 2008 VT 94, ¶ 11, 184 Vt. 602, 958 A.2d 673 (mem.) (dismissing Rule 60 motion filed seven years after judgment); *Riehle v. Tudhope*, 171 Vt. 626, 765 A.2d 885 (2000) (mem.) (five years); *Martin v. Martin*, 154 Vt. 651, 578 A.2d 110 (1990) (mem.) (two years).

■ ¶ 79. We note, furthermore, that the Town has failed to show that any cognizable hardship will be visited on it as a result of the trial court's decision. Rule 60(b)(6) is "a general catch-all provision," and as such it is "designed to give the court the flexibility to see that the rule serves the ends of justice." Reporter's Notes, V.R.C.P. 60. Basically, the provision is used for "the prevention of hardship or injustice." *In re Merrill*, 157 Vt. 150, 153, 596 A.2d 345, 347 (1991). That said, "there are necessarily limits on when relief is available." *Richwagen v. Richwagen*, 153 Vt. 1, 4, 568 A.2d 419, 421 (1989).

■ ¶ 80. The "hardship" that the Town asserts it will suffer as a result of *Unnamed Road I* is the $830,000 in damages awarded by the trial court. We have remanded the case for reconsideration of the damage award, however, and any damages ultimately awarded by the trial court on remand principally compensates Rhodes for the violation of his constitutional rights and not for the classification of the Unnamed Road except insofar as that decision was part of the Town's pernicious discrimination. To the extent that the Town claims the hardship stems from its ownership interest in the Unnamed Road right-of-way, this also fails. There was no error in the trial court's denial of the Town's Rule 60(b) motion.

¶ 81. In closing, we underscore the unique circumstances that both support this decision and necessarily limit its scope. The trial court's unchallenged findings describe a deliberate, decades-long course of discriminatory conduct by the Town so malicious and self-serving as to deny Rhodes his fundamental rights to due process and equal treatment under the Vermont Constitution. Absent such egregious misconduct, and clear proof of the exacting elements necessary for relief, towns and local officials have no cause for concern about the myriad decisions made in the normal

exercise of authority. Failing to recognize a remedy in a case such as this, however, would undermine the constitutional principles that all Vermonters hold dear. Vermont has consistently sustained its essence as one big small town by affirming and reinforcing the fundamental values that define it. This decision affirms those values.

*The judgment of liability against the Town of Georgia is affirmed. The damage award is reversed, and the matter is remanded for further proceedings on the issue of damages consistent with the views expressed herein.*

¶ 82. **Dooley, J.,** concurring and dissenting. In this case, we are asked to decide whether the Common Benefits Clause, Vt. Const. ch. I, art. 7, is self-executing and under the facts presented entitles Rhodes to bring a claim for money damages. The majority answers both questions affirmatively, concluding that the selectboard's actions unconstitutionally discriminated against Rhodes and remands for a damages award. I wholly concur that Article 7 is a self-executing provision and that a plaintiff disparately treated by a government official motivated by personal ill will may recover monetary damages for a violation of Article 7 under certain circumstances. Considering the unchallenged findings in this case, it is uncontroverted that selectboard members discriminated against Rhodes in preference for his neighbors. Nonetheless, I disagree that a damages action is appropriate because in this case there was an alternative avenue of relief available to Rhodes to cure the constitutional violation. Therefore, I dissent from the majority's decision to remand this case for an assessment of damages.

¶ 83. In *Shields v. Gerhart*, this Court first recognized the availability of a state constitutional tort action for money damages. 163 Vt. 219, 658 A.2d 924 (1995). We set forth a two-step process for determining the availability of such an action, inquiring first whether the constitutional provision is self-executing and second "whether monetary damages are available as a remedy for a violation." *Id.* at 222, 658 A.2d at 927. We cautioned against creating such a private damages remedy where there existed alternate means for relief "even where the Legislature has provided no alternative civil remedy." *Id.* at 232, 658 A.2d at 933. Despite the majority's reiteration of this cautionary principle and its pronounced commitment to engaging in "a careful inquiry" of

the facts, *ante*, ¶¶ 35-36, it has not followed this fundamental holding of *Shields* that money damages are not available when there is another adequate remedy. 163 Vt. at 234-35, 658 A.2d at 934. Here, such an alternative was available in the form of injunctive relief.

¶ 84. Though the history of this case is lengthy and complicated, it is important to emphasize at the outset that the court awarded damages solely for one reason — to compensate Rhodes for the selectboard's decision to classify the Unnamed Road as a trail. In analyzing alternative remedies, the majority decision goes awry by looking for a remedy for all of the selectboard's actions with respect to Rhodes. Thus, it bases its damages remedy on "the selectboard's intentional abuse of office over the course of more than a decade through decisions concerning the Unnamed Road and TH #20 that prevented, obstructed, and delayed [Rhodes's] efforts to access his property." *Ante*, ¶ 46. I do not believe that the selectboard's longtime favoritism related to Town Highway #20 (TH #20) should determine whether damages are appropriate for wrongful action with respect to the Unnamed Road. But see *ante*, ¶ 45 (emphasizing "selectboard's repeated failure to provide fair and impartial decisionmaking"). It is instead the selectboard's relatively recent and singular decision to classify the Unnamed Road as a trail that is at issue.[11]

¶ 85. I thus focus on whether such classification could be remedied in an alternative fashion, and conclude that this is not the type of case "[w]here damages must be recognized to give a plaintiff some remedy." *Shields*, 163 Vt. at 233, 658 A.2d at 933. This principle in *Shields* reflected the reasoning of *Bivens v. Six Unknown Named Agents* that damages may be awarded for constitutional violations when those violations cannot be remedied by other means. See 403 U.S. 388, 410 (1971) (Harlan, J., concurring).

¶ 86. The illustration in *Shields* of such a circumstance was where a state official breached an individual's right to be free

---

[11] While the majority claims that Rhodes generally sought relief in his complaint for damages, *ante*, ¶ 51, when read in context, the phrase of the trial court's order cited by the majority plainly delineates that the damages were for the selectboard's decision to classify the Unnamed Road as a trail. The full quote reads: "When one considers the Town's classification of the unnamed road, two factors stand out. First, the Town's decision is part of a consistent pattern of discriminatory conduct that has lasted for more than twelve years."

from unreasonable search or seizure. 163 Vt. at 233, 658 A.2d at 933 (citing *Moresi v. Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1093 (La. 1990)). In that type of case, the deprivation of the constitutional right to be protected against unreasonable searches could not be undone or remedied through any other means and therefore a monetary award was appropriate. *Id.* *Bivens* presented a similar factual scenario where the petitioner alleged that federal agents under color of law subjected him to an unconstitutional search and seizure. 403 U.S. at 389. In his concurrence, Justice Harlan explained that the issue was whether there was "power to authorize damages as a judicial remedy for the vindication of a federal constitutional right." *Id.* at 401-02 (Harlan, J., concurring). He reasoned that such a remedy was necessary for someone like Bivens because "it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged position. It will be a rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive relief from any court." *Id.* at 409-10.

¶ 87. Here, Rhodes asserted no lasting damage from the trail classification that could not be remedied by a decree reversing that decision. He alleges no damage to his land or his economic interest. While he plans at some point to develop this land, he has no concrete plan to do so. In fact, Rhodes's amended complaint sought a declaration undoing the selectboard's classification and monetary damages "[i]n the alternative." Thus, for Rhodes, in contrast to Bivens, there is means for him to "obviate the harm by securing injunctive relief." *Id.* at 410.

¶ 88. The main case cited by the majority in support of damages further illustrates this distinction. In *Brown v. State*, 674 N.E.2d 1129 (N.Y. 1996), a group of nonwhite plaintiffs sued police officers alleging state constitutional violations for stopping and interrogating them without cause and based solely on their race. The New York Court of Appeals held that the plaintiffs could bring a cause of action to recover damages against the state for violations of the equal protection and search and seizure clauses of the state constitution. *Id.* at 1138-39. *Brown* emphasized that damages were available when other remedies, including injunctive or declaratory relief, were inadequate. *Id.* at 1141. In *Brown*, the court explained that no injunction or declaration could correct the invasion that the plaintiffs had already experienced, and, therefore, damages were the "appropriate remedy for the invasion of personal interests in liberty." *Id.*

¶ 89. In contrast, courts decline to recognize a monetary action where an alternative remedy could address the asserted violation of the plaintiff's particular constitutional right. See *Shields*, 163 Vt. at 234, 658 A.2d at 934 (noting general rule that a private damage action under the constitution will not be recognized "where the plaintiff has an administrative or common-law remedy to obtain the governmental benefit or license sought or the restoration of employment or the like"); see also *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 64, 165 P.3d 1079 (concluding that there was no action against oil company for violation of state constitutional right to clean and healthful environment where common law provided an adequate remedy); *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992) (holding that direct claim may be brought to vindicate state constitutional rights "in the absence of an adequate state remedy").

¶ 90. An alternative remedy includes the ability to seek redress through judicial decree. *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 356 (Cal. 2002) (concluding that no action for damages was available where plaintiff could have sought to remedy the alleged violation of his due process liberty interest by seeking declaratory or injunctive relief). As the U.S. Supreme Court recognized in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001), "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." As an example of a case in which an alternative remedy was available, *Shields* discussed *Kelley Property Development, Inc. v. Town of Lebanon*, 627 A.2d 909, 919-24 (Conn. 1993), in which a developer alleged that the town had violated his state constitutional due process rights in denying his subdivision application. The court held that no private damage action was appropriate because the developer had other available avenues of relief, including bringing an equitable claim to undo the town's wrongful conduct. *Id.* at 923. The majority identifies this principle and, in fact, cites such cases where no private damage action is recognized because the injury resulted from an ongoing policy or administrative decision that could be cured by an injunction. *Ante*, ¶ 42 (citing *Rockhouse Mountain Prop. Owners Ass'n v. Town of Conway*, 503 A.2d 1385, 1388-89 (N.H. 1986) (denying damage remedy for town's alleged equal-protection violation in refusing to lay out village roads where adequate alternative relief was available)); *ante*, ¶ 47 n.5 (citing *City of Hueytown v. Jiffy Chek Co.*

*of Ala.*, 342 So. 2d 761 (Ala. 1977) (affirming use of equitable relief in response to equal protection violation); *Herrick's Aero-Auto-Aqua Repair Serv. v. Dep't of Transp. & Pub. Facilities*, 754 P.2d 1111, 1116 (Alaska 1988) (denying action for damages because injunctive relief was available and could right the violation of equal protection asserted by plaintiffs)). Nonetheless, the majority fails to acknowledge the similarity to this case where judicial decree can cure the selectboard's unconstitutional action classifying the Unnamed Road as a trail.

¶ 91. At first blush, it might appear that our law does not have a preference for an equitable remedy over the legal remedy of damages generally and, therefore, one can argue that there should be no such preference in providing a remedy for a Vermont constitutional violation. Indeed, the general maxim is that "[e]quity will not afford relief where there is a plain, adequate, and complete remedy at law." *Gerety v. Poitras*, 126 Vt. 153, 155, 224 A.2d 919, 921 (1966). This maxim is very limited, however, because "the legal remedy 'must be competent to afford relief on the very subject matter in question, and be equally convenient, beneficial and effective' as the equitable remedy which would otherwise be available." *In re C.B.*, 147 Vt. 378, 381, 518 A.2d 366, 369 (1986) (quoting *Poulin v. Town of Danville*, 128 Vt. 161, 165-66, 260 A.2d 208, 211 (1969)). The remedy at law must be " 'practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.' " *Poulin*, 128 Vt. at 166, 260 A.2d at 211 (quoting *Hall v. Vill. of Swanton*, 113 Vt. 424, 428, 35 A.2d 381, 384 (1944)). Also relevant here, "one of the primary functions of equity is to afford complete relief while avoiding multiplicity of litigation." *C.B.*, 147 Vt. at 381, 518 A.2d at 369.

¶ 92. As Professor Douglas Laycock noted in his seminal work on the availability of equitable remedies: "[r]emedies that prevent harm altogether are better for plaintiffs." D. Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 689 (1990). In making this point, he quoted Pomeroy's treatise Equity Jurisprudence: " 'a remedy which *prevents* a threatened wrong is in its essential nature better than a remedy which permits the wrong to be done, and then attempts to pay for it.' " *Id.* (quoting 3 J. Pomeroy, Equity Jurisprudence § 1357, at 389 (1st ed. 1887)). Professor Laycock concluded that courts have analyzed the adequacy of damage remedies such that the preference has become reversed: "our law embodies a preference for specific relief if

plaintiff wants it." *Id.* at 691. He noted from examining decisions that courts "find damages adequate . . . only when there is some identifiable reason to deny specific relief in a particular case." *Id.* A holding that an equitable remedy is preferable to a damages remedy in this case is entirely consistent with our general law.

¶ 93. I recognize that I am arguing that the lack of preference between equitable and legal remedies in our remedies law generally should become a required preference when we are enforcing Vermont constitutional rights without an implementing statute. I believe that the unique nature of constitutional enforcement requires that we leave a damage remedy as a last resort.[12] Our own precedent in *Shields*, the *Bivens* line of cases, and the decisions from other states support this principle.

¶ 94. The majority acknowledges that an injunctive remedy is not "invariably inadequate," *ante*, ¶ 47 n.5, but says it is inadequate in this case because "it does not cure the personal harm inflicted in an exceptional case such as this, involving a lengthy pattern of invidious delay, obstruction, and discriminatory decisionmaking." *Id.* ¶ 47. This statement falsely assumes that constitutional damages will necessarily result when the alternative remedy does not completely compensate the injury. Indeed, under the majority's standard, there will never be an adequate alternative.

¶ 95. That the alternative remedy is less generous than the damages available from a constitutional tort does not negate the alternative and automatically mean that a damages action is viable. The two need not be wholly congruent. As we explained in *Shields*, since *Bivens* the U.S. Supreme Court has retreated from its initial stance and does not recognize a remedy for damages where there are other available civil remedies, even if those do not

---

[12] One source of the underlying law for this choice is our policy with respect to creating a damage remedy for violation of statutory rights. In *Dalmer v. State*, 174 Vt. 157, 167-68, 811 A.2d 1214, 1224 (2002), we held that we would apply § 874A of the Restatement (Second) of Torts to the question of whether to create a civil damages remedy for violations of the Juvenile Procedures Act. That section provides that a "civil tort remedy for violation of a statute is proper only if the statute 'protects a class of persons by proscribing or requiring certain conduct' and 'the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision.'" *Dalmer*, 174 Vt. at 167-68, 811 A.2d at 1224 (quoting Restatement (Second) of Torts § 874A (1979)). Similarly, the question here is whether a civil damages remedy is necessary to ensure the effectiveness of Article 7.

fully compensate the plaintiff for the harm suffered. *Shields*, 163 Vt. at 228-30, 658 A.2d at 931-32; see *Kelley*, 627 A.2d at 921 ("It is no longer sufficient under federal law to allege that the available statutory or administrative mechanisms do not afford as complete a remedy as a *Bivens* action would provide."). Following these cases, most courts agree that damages are not awarded to compensate an individual to the fullest extent possible, but to provide a deterrent effect and to ensure that there is some relief available for the constitutional violation.

¶ 96. Even if the majority's new adequacy standard were the law, I do not believe it would require any greater remedy than an injunction in this case. Rhodes did not allege or prove — and the superior court did not find — that the selectboard's decision classifying the Unnamed Road as a trail caused him any physical or emotional damage. His sole complaint was that the selectboard's decision harmed his property interest by restricting his access to his property.[13] At trial, Rhodes's theory was that the classification decreased the value of his property because he no longer had road access to part of his land and therefore could not develop that part. He sought damages, based on a comparable sales approach, in the amount of the difference in the property's value with and without road access.

¶ 97. As the majority holds, the trial court's damages award based on Rhodes's theory was inappropriate because the court treated the Town's action as a taking, giving Rhodes an amount equal to the loss of value of his land caused by the prohibition on vehicular access. We held in *Whitcomb v. Town of Springfield*, 123 Vt. 395, 397, 189 A.2d 550, 552 (1963), that the downgrading of a town road to a trail does not involve taking more land from abutting landowners and, therefore, cannot be the cause of takings damages. See also *Ketchum v. Town of Dorset*, 2011 VT 49, ¶ 13, 190 Vt. 507, 22 A.3d 500 (mem.) (reaffirming *Whitcomb*). We added in *Perrin v. Town of Berlin*, 138 Vt. 306, 307, 415 A.2d 221, 222 (1980), that the loss of town maintenance that resulted from the downgrade to a trail "is not a right in the landowner, but is a

---

[13] Given that Rhodes's request for damages was limited to compensating him for damage to his property interest, it is therefore perplexing that the majority would conclude that Rhodes is entitled to "an award of civil damages for the mental or emotional distress resulting from" the Town's misconduct. *Ante*, ¶ 51. Rhodes did not plead, or present evidence of, emotional harm. Consequently, the trial court made no finding regarding mental injury.

right held in common by all the citizens" and, thus, cannot be the basis for compensation to the abutting landowner. The superior court damage remedy ran afoul of these holdings. I therefore agree with the majority that if Rhodes were entitled to damages, the measure used by the superior court cannot be affirmed.

¶ 98. If Rhodes has any entitlement to damages for a difference in the value of land, it would be for the temporary deprivation of development potential "for the period of time the [discriminatory land use decision] actually delayed the development of the project." *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008); see also *Town of Orangetown v. Magee*, 665 N.E.2d 1061, 1068-69 (N.Y. 1996). A key requirement is that damages will be appropriate only if the discriminatory action caused "actual delay" in development. *N. Pacifica*, 526 F.3d at 487. Since plaintiff had no concrete plans to develop the area of his property reachable by the Unnamed Road, there was no actual delay, and, therefore, he is entitled to no damages. Further, it makes no sense to award damages for loss of development potential when an injunction will stop the loss.

¶ 99. The majority suggests alternatively that Rhodes may be entitled to two types of damages — emotional distress damages because of his treatment by the Town selectboard and damages representing the difference between the cost of upgrading the Unnamed Road at the time damages are measured and the cost Rhodes would have paid to upgrade it when the selectboard classified it as a trail. I would not hold that these damage elements are recoverable.

¶ 100. As stated above, plaintiff never sought or proved that he suffered any emotional damages and specifically never sought damages for "anguish and inconvenience." *Ante*, ¶ 49. No damages are due without proof of "actual injury." *Farrar v. Hobby*, 506 U.S. 103, 112 (1992). This may include economic, physical, or emotional injury, but the mere violation of a constitutional right without any proximate injury is insufficient to warrant damages. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307-08 (1986). If plaintiff is to recover damages based on emotional distress, he must prove that "such injury actually was caused." *Carey v. Piphus*, 435 U.S. 247, 264 (1978) (discussing emotional distress

damages based on a claim of a due process violation). He never did so here.[14]

¶ 101. For this reason, I am at a loss to understand what will occur in the remand ordered by the majority. The Town appealed the award of damages and the amount and prevailed on the amount issue. The majority acknowledges there must be "proof of actual injury." *Ante,* ¶ 51. There was no such proof, and, thus, Rhodes has waived any claim of emotional distress damages. Thus, the trial court must award no damages unless the testimony is reopened to allow Rhodes to prove an element of damages he never sought. It would be a manifest injustice to the Town to allow Rhodes, who never appealed and lost on his measure of damages theory, a new opportunity to prove damages he did not claim. See *Havill v. Woodstock Soapstone Co.,* 2007 VT 17, ¶ 10, 181 Vt. 577, 924 A.2d 6 (mem.) (explaining that issues not raised in original appeal are beyond scope of remand and therefore, on remand, no new evidence should be taken on an element of damages not previously sought).

¶ 102. The second damage element — the differential cost of upgrading the road — should not be recoverable in light of the superior court's finding that Rhodes has no specific plans for development. Rhodes is not entitled to the difference in the cost of road improvements between the cost at the time of the selectboard's classification decision and the cost today. Because he has never had specific plans to develop the property, he never would have expended the lesser amount. Further, any plans to develop the road in the future are speculative, and the costs of developing the road will presumably be covered by the proceeds from selling the developed lots.

¶ 103. If the superior court had issued an injunction against the classification of the Unnamed Road as a trail in 2010, this case would have been over, and Rhodes could have developed his property if he desired. Because the issuance of the injunction is a complete alternative remedy to damages, I would reverse the compensatory damages award, and remand for the trial court to issue an injunction. In all other respects, I concur in the majority decision.

---

[14] I repeat my earlier point that liability is based on the reclassification of the Unnamed Road and not on the interactions between Rhodes and the selectboard concerning TH #20 or other subjects.

¶ 104. I am authorized to state that Chief Justice Reiber joins in this concurring and dissenting opinion.